IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH A. BARKER, REGIONAL DIRECTOR OF REGION 13 OF THE NATIONAL LABOR RELATIONS BOARD, FOR AND ON BEHALF OF THE NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) ) | Case No. 06 C 5490 |
| | | Judge Virginia M. Kendall |
| Plaintiff, | ) | |
| v. | ) ) | |
| INDUSTRIAL HARD CHROME LTD., BAR TECHNOLOGIES LLC, FLUID POWER MANUFACTURING, a single employer, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Regional Director of Region 13 for the National Labor Relations Board ("Petitioner") seeks injunctive relief pursuant to 29 U.S.C. § 160(j) ("10(j)")[1] against Industrial Hard Chrome, Ltd. and its affiliates ("Respondent") for reinstatement of discharged employees pending the resolution of a charge currently before the National Labor Relations Board (the "Board"). Because Petitioner has failed to show by a preponderance of the evidence that it has been irreparably harmed, two required elements for a preliminary injunction pursuant to § 160(j), Petition's request for preliminary injunction is denied.

## Statement of Facts

On July 6, 2006, the United Steelworkers of America, AFL-CIO, CLC (the "Union") filed a charge with the Board concerning an incident among the second-shift Union employees at

---

[1] Legislative history and case precedent commonly refer to this section as section 10(j), the section number in the National Labor Relations Act. Likewise, 29 U.S.C. §§ 157-159 and their subparts are hereafter referred to as Sections 7 through 9.

Respondent's Industrial Hard Chrome ("IHC") plant, which incident also affected employees at Respondent's neighboring Bar Technologies, Inc. ("Bar Tech") plant. In the week of October 10, 2006, an Administrative Law Judge ("ALJ") heard argument and testimony concerning the charge. On October 10, 2006, after receiving approval from the Board to file the petition, Petitioner sought injunctive relief from this Court pending the ALJ's decision. The Court permitted limited discovery on the issues that merit injunctive relief, accepted briefing and then held a hearing on January 8, 2007 with testimony from the parties and cross-examination to establish or refute whether an injunction in this matter would be "just and proper." The following facts are drawn from the transcript and exhibits from the hearing before the ALJ, submitted to this Court by agreement of the parties, ("Admin. Tr." and "Admin. Ex.") as well as the testimony before this Court at the preliminary injunction hearing on January 8, 2007 (the "Hearing").

In March/April 2005, the employees of Respondent elected to have the Union be their exclusive bargaining agent. (Admin. Tr. at 109). Over the course of the following year, Respondent and Union representatives, including three employees of Respondent on the Union's bargaining committee, negotiated to establish the initial Collective Bargaining Agreement ("CBA"). As of June 2006, negotiations for the initial CBA were ongoing and the two sides had met approximately forty times, but no CBA had been completed and signed.

The three employees of Respondent on the Bargaining Committee were Paris Figueroa ("Figueroa"), an employee of IHC, Jesus Salgado ("Salgado"), an employee of Bar Tech, and Steven Swanson, ("Swanson"). The other members of the Union's bargaining committee were Alfonso Martinez ("Martinez") and Mark Trone ("Trone"), the Union representatives. Figueroa and Salgado are bilingual in Spanish and English; the other members of the Union's bargaining committee speak

only English. Between sixty and seventy percent of Respondent's employees are native Spanish speakers and know little or no English.

On June 23, 2006, a Friday evening, the second shift workers had a break period between 9 p.m. and 9:15 p.m. IHC used a buzzer to signal the commencement of shifts, as well as the commencement and end of fifteen-minute breaks. About two minutes before the buzzer sounded to commence the break, the employees began walking to the lunch area. (Admin. Tr. at 57). Daniel Bustamante ("Bustamante"), an employee of IHC management who, according to testimony at the Hearing, had transferred to supervising the second shift approximately two weeks earlier, orally reprimanded the employees for taking a few additional minutes before and after their breaks. (Admin. Tr. at 57-58, 140).

On June 26, 2006, a Monday, the second-shift employees at IHC found a "warning" posted on the memo board concerning the employees' failure the previous Friday to adhere to the break times set by the buzzer. (Admin. Tr. at 21-22, 109-111). Figueroa, one of the second-shift employees, orally translated the English warning into Spanish for the benefit of the other employees. (Admin. Tr. at 21-22). Some of the employees gathered by Bustamante's desk and asked to speak with Bustamante's manager, Bruce Busse ("Busse"). Bustamante agreed to allow the group to speak with Busse, went to Busse's office, and Busse came to the workspace. (Admin. Tr. at 113). Busse spoke with the employees and told them that they needed to respect the buzzer. (Admin. Tr. at 25-26, 113). Figueroa responded on behalf of the employees that Bustamante had enforced the break-time rule arbitrarily. (Admin. Tr. at 113). Busse agreed to remove the warnings and told the employees to return to work. (Admin. Tr. at 27, 115).

The following day, June 27, 2006, on the way into work for the second shift, Figueroa testified that Daniel Bustamante argued with employee Heraclio Arizaga ("Arizaga"). (Admin Tr. at 28). Figueroa could not see who initiated the argument. (Admin. Tr. at 28, 32). Arizaga testified that, as he was passing Bustamante's desk at the start of his shift, Bustamante called him a "cry baby" in Spanish, and then proceeded to shout that Arizaga knew why he deserved to be called a cry-baby. (Admin. Tr. at 117-19). Figueroa testified that Bustamante and Arizaga were very close to one another and shouting, although he could not hear the subject; Arizaga testified that Bustamante actually touched Arizaga's chest with his own, and came close enough to him that Bustamante's saliva hit Arizaga's face. (Admin. Tr. at 31, 78, 117-19). Bustamante told Arizaga in front of the second-shift workers that Arizaga would be fired. (Admin. Tr. at 31, 148). Bustamante did not fire Arizaga at that time. (Admin. Tr. at 148-49). Figueroa tried to intervene and suggest that the dispute be discussed privately. (Admin. Tr. at 36). Bustamante also told all the second-shift employees that he could/would fire any "buey" who did not return to work. "Buey" is a Spanish term generally used in a derogatory manner and which Arizaga took as derogatory. (Admin. Tr. at 37, 119-20).

After conversation among the employees who witnessed the argument between Arizaga and Bustamante, certain of the employees of the second shift demanded to speak with Busse, and then collectively walked off the job in protest of Bustamante's behavior toward Arizaga. (Admin. Tr. at 37-38, 79, 120-22). According to Figueroa, between 16 and 18 employees left the plant and waited at the picnic tables outside the plant. (Admin Tr. at 39). Another employee, Phanvilay ("Hit") Sundera, took Bustamante into one of the offices to speak with him; when Bustamante returned, he told the employees that they had five minutes to return to work. The employees refused. (Admin. Tr. at 122-23, 158, 242-45). Instead, the employees asked to speak to higher management about

Bustamante's conduct. (Admin. Tr. at 155-56). It is not clear whether the employees walked out to the picnic tables before or after Hit Sundera spoke with Bustamante.

While at the picnic tables, Figueroa called Martinez and the police regarding the incident between Arizaga and Bustamante. (Admin. Tr. at 43). Figueroa then went to Bar Tech and spoke with Salgado, whereupon approximately 12-14 members of Bar Tech walked out and joined the IHC employees at the tables. (Admin. Tr. at 44-45, 129, 178-79). There were approximately 22-25 employees of the two companies out at the tables; slightly less than half of these employees were from Bar Tech. (Admin. Tr. at 50, 130, 176).

Two police officers arrived and began to take a report from Arizaga. (Admin. Tr. at 48-49). While taking the report, IHC General Manager Fred Parker ("Parker") came out of the plant. (Admin. Tr. at 49). Parker informed the officers that this was a work stoppage, and then asked the employees if they would return to work; the employees did not answer Parker. (Admin. Tr. at 50). Parker then addressed his question specifically to Figueroa, who answered that he would return to work, but was waiting for Martinez to arrive. (Admin. Tr. at 50, 133). According to Figueroa, Parker answered that Figueroa "had no Union Representative" and told him he was fired. (Admin. Tr. at 51, 133). According to both Figueroa and the police officer, the officer then told Figueroa to leave the premises, and told the employees at the tables that if they didn't work at the plant they needed to leave as well. (Admin. Tr. at 52, 151-52, 268). Salgado testified that the officers told all the employees that they needed to leave the premises because they were not allowed to be on the property. (Admin. Tr. at 187). Salgado also testified, however, that he and the other employees "chose" not to return to work "because he [Parker] was firing our union representative." (Admin. Tr. at 218). The police officer testified that after the other employees left, Arizaga changed his

account of the confrontation with Bustamante and denied that there had been any physical contact. Arizaga did not press charges for the battery. (Admin. Tr. at 272-73).

The following morning, June 28, 2006, the second shift employees who had not returned to work the night before contacted the first shift (daytime) employees as they were entering the plants, and members of both shifts protested the termination. (Admin. Tr. at 54-55, 137). About 60 employees were present and carried signs. (Admin. Tr. at 84, 351). Martinez testified that, when he spoke with manager Petersen on the morning of June 28, Petersen conveyed to Martinez that all of the second-shift employees had been fired. (Admin. Tr. at 352). The employees continued to picket on June 29, 2006 (Admin. Tr. at 195). On June 30, each of the second-shift employees that had left the premises on June 27 received a letter from IHC or Bar Tech stating that there was a rumor that several second-shift employees had been fired, but that in fact only one person had been fired. Salgado testified that he "understood that [the letter] says rumor. But the feeling that moment I was fired." (Admin. Tr. at 232, Resp. Admin. Ex. 40). But Salgado also admitted that he understood the "one person" actually fired to be Figueroa. (Admin. Tr. at 232).

Over the next several days, some first-shift employees crossed the picket lines and returned to work. On July 6, 2006, the Union filed the charge with the Board. On July 31, 2006, Respondent sent a letter to each of the second shift employees who had not returned to work, stating that they had been terminated for continuing absence or an illegal strike. On August 18, 2006, the Union filed a Complaint with the Board seeking preliminary reinstatement of the terminated employees pursuant to Section 10(j), whereupon the Union called off the protest in front of Respondent's plant. (Admin. Pet. Ex. 1(g)). The remaining protesting first-shift employees returned to work at that time.

At the Hearing, Trone testified that between the date of the filing of the Board charge and the present, the Union and Respondent continued negotiations toward an initial CBA. Between August and December 2006, the parties engaged in approximately ten collective bargaining sessions, approximately seven of which were attended by terminated bargaining committee members Figueroa and Salgado. Starting December 6, 2006, Respondent objected at the start of the collective bargaining session to the presence of Figueroa, who had at that point taken employment with a different employer; Respondent based its objection to Figueroa's presence on confidentiality grounds. Figueroa left the session, after which the Union and Respondent continued bargaining. At the last meeting, December 20, 2006, Respondent refused to negotiate the Union if Salgado were present, because Salgado was not employed by Respondent. According to Trone, the Union refused to negotiate without Salgado, so Respondent left the session without bargaining.

## Standard

Relief pursuant to Section 10(j) should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." *National Labor Relations Board v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996), *quoting Szabo v. P*I*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989). The Court views whether an injunctive remedy would be "just and proper" with an eye toward traditional equitable principles that normally guide a court in granting injunctive relief. *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001); *see also Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir. 1989).

"In the context of a 10(j) petition, a federal court has no jurisdiction to pass on the merits of the underlying case before the Board." *Electro-Voice,* 83 F.3d at 1567, *citing Squillacote v. Graphic*

*Arts Int'l Union, Local 277*, 513 F.2d 1017, 1021 (7th Cir. 1975). To determine the merits of section 10(j) injunctive relief, Petitioner bears of the burden of proof of the elements of a four-part test: (1) no adequate remedy at law; (2) public harm will result absent the injunction; (3) the labor effort will be irreparably harmed, and that such harm outweighs irreparable harm to the employer; and (4) some likelihood of success on the merits - a "better than negligible" chance of winning the suit before the Board. *See Electro-Voice*, 83 F.3d at 1567-68, *discussing Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386-87 (7th Cir. 1984); *accord Bloedorn v.* 276 F.3d at 286. Petitioner must satisfy the first three requirements by a preponderance of the evidence; however, Petitioner need not show that the harm to the labor effort outweighs the harm to the employer if Petitioner can make a strong showing on the fourth requirement. *See Electro-Voice*, 83 F.3d at 1567-68; *accord Moran v. LaFarge North America, Inc.*, 286 F. Supp. 2d 1002, 1007 (N.D. Ind. 2003).

The Seventh Circuit has not yet articulated a rule about the appropriate deference in evaluating a 10(j) request for interim injunctive relief. *See Bloedorn*, 276 F.3d at 287 n.9 (discussing the position of various circuits on deference in 10(j) context). The standard for evaluation of a 10(j) petition remains "whether the Board has demonstrated that relief is 'just and proper' under the approach traditionally applied to equitable cases filed by public agencies." *Id.* at 287 n.9, *quoting Kinney*, 881 F.2d at 493. When the district court does not hold a hearing, hear testimony, or assess the credibility of witnesses, such that the only evidence before the court is the Administrative Record, the Regional Director is entitled to a favorable reading of that record. *Bloedorn*, 276 F.3d at 287. However, when a hearing is held, presumably the district court is entitled to weigh the testimony and judge the credibility of the witnesses as it would in any preliminary injunction, and take those credibility determinations under advisement in conjunction with the record before it.

In this case, shortly after Petitioner filed the 10(j) Complaint in this Court, Petitioner requested an evidentiary hearing. The Court granted Petitioner's request for hearing and permitted discovery on the issues related to interim relief. A hearing date was set weeks out from the actual hearing in order to allow Petitioner an opportunity to prepare its witnesses and present its case. The Court the held the Hearing with witness testimony, opportunity for cross-examination, and oral argument by the parties. Petitioner chose to present two witnesses at the Hearing: Figueroa and Trone.

Likelihood of Success on the Merits

Petitioner maintains that it has a high likelihood of proving before the Board that Respondent has violated Sections 8(a)(1) and (3) of the Act by engaging in unfair labor practices. At the 10(j) preliminary injunction stage, the Court's inquiry is limited to the probability that the Regional Director will prevail in the underlying complaint. *Bloedorn*, 276 F.3d at 287. To satisfy the "likelihood of success on the merits" prong at the 10(j) injunction stage, Petitioner need not prove the underlying merits of the action by a preponderance of the evidence; Petitioner need only prove that it has a "better than negligible" chance of success. *See Electro-Voice*, 83 F.3d at 1570; *accord Roland Machinery*, 749 F.2d at 387.

Section 8(a)(1) makes it unlawful to "interfere with, restrain, or coerce employees" while they are engaged in the exercise of their rights protected by Section 7, including the right to engage in "concerted activities for the purpose . . . of mutual aid or protection. . ." 29 U.S.C. §§ 157, 158; *discussed in Bob Evans Farms, Inc. v. NLRB*, 163 F.3d 1012, 1019 (7th Cir. 1998) (declining to enforce ALJ order to reinstate employees); *Trompler, Inc. v. NLRB*, 338 F.3d 747, 749 (7th Cir. 2003) (enforcing ALJ order to reinstate employees). Concerted activities that relate to the terms and

conditions of employment are protected activities under section 7. *See NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 17 (1962). While choice of a supervisor is the management's decision, "[a] complaint that a supervisor's conduct is impairing the terms or conditions of the employment of the workers whom he supervises is, however, a legitimate subject for concerted activity." *Trompler*, 338 F.3d at 749. But "worker protests precipitated by employer action (or inaction) concerning supervisory personnel *that are unrelated to the terms and conditions of employment* are unprotected regardless of the reasonableness of the means of protest chosen. . ." *Id.* (emphasis in original).

Petitioner does not have a likelihood of success on the merits on the Section 8(a)(1) charge. The facts reveal that there is little or no connection between the June walk-out and work conditions for the employees at the plant. Rather than a concerted effort to complain about the terms and conditions of employment, the record and the testimony reflect that this small group of employees walked out to show sympathy for a colleague whom they believed was being treated disrespectfully on one particular day. The facts show that 22-25 of the employees at Respondent's plants walked out after a single incident between a single supervisor and a single employee in which the supervisor made personally offensive remarks to the employee. Although the second-shift employees had expressed dissatisfaction with Bustamante's posted warning about break times the previous day, the employees immediately were given an opportunity to address that issue the prior day with upper management and the issue was resolved in the employees' favor: the warnings regarding break times were removed and no employee was sanctioned. Nothing in the Administrative Record nor the testimony at the Hearing suggested that the walkout on June 27 was the result of the break times or other terms of conditions of employment for all of the employees. Rather, the record and testimony

reflect that the employees felt Arizaga had been treated poorly and that they needed to show their support for him.

Petitioner cites *East Chicago Rehabilitation Center v. NLRB*, 710 F.2d 397 (7th Cir. 1992), to support that the employees were justified in using a walk out to "'show how angered they were" at the treatment by Bustamante." Pet. Br. at 10, *citing East Chicago*, 710 F.2d at 400. But *East Chicago* highlights the key factor missing in this case: that the basis for the walkout be a term or condition of employment. The employees in *East Chicago* came to work to find a note setting a unilateral change to their ability to leave the premises for their lunch hours. *East Chicago*, 710 F.2d at 399. The employees walked out to protest, and immediately followed their Union's instruction to return to work, at which point the employer refused to accept them. The *East Chicago* court permitted a brief protest where the employees "merely wanted to show how angered they were by the *unilateral change in lunch rules.*" *Id.* According to Petitioner's brief, the employees walked out to show anger at Arizaga's treatment by supervisor Bustamante. Pet. Br. at 10.

At the Hearing, Petitioner stated that the employees' concerted protest was due to the "hostile work environment" initiated by supervisor Bustamante's ill treatment of fellow employee Arizaga. Although not specifically applicable to an 8(a)(1) and (3) violation, to the extent that Petitioner uses this term to define a violation of a working condition, the Court notes that in the context of employment discrimination, an employer may be liable for the creation of a hostile work environment if an employee can show: (1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability. *See Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686 (7th Cir. 2005). While Bustamante's remarks

may very well have been inappropriate or offensive, the record before the Court does not suggest that Respondent had created a hostile work environment. The record does not indicate that Bustamante treated all employees with disrespect, nor does the record support that he had a pattern of abusive supervising. Bustamante was transferred to the shift only shortly prior to the incident and none of the walk-out employees had any previous contact with him. At the Hearing, Petitioner and its witnesses described the working condition of which they were protesting as a "hostile working environment." Yet the record fails to support any other incidents between this Supervisor and the walk-out employees. Other than one prior complaint about Bustamante, more than a year prior to this incident and not between these employees, and with no complaints in the intervening year, there is no record of any prior negative incidents between Bustamante and the employees to support the position that a "hostile work environment" existed.[2]

Petitioner has also brought a charge against Respondent for violation of Section 8(a)(3). "Section 8(a)(3) prohibits employers from terminating employees solely on the basis of their Union activities or sympathies." *Electro-Voice*, 83 F.3d at 1568. The employer's actions must have been motivated by a desire to discourage union membership. *See Bloedorn*, 276 F.3d at 289. For the

---

[2] Respondent also argues that even if Bustamante's conduct concerned a term or condition of employment so as to be a legitimate subject for concerted activity, the method of protest was not reasonable in comparison to the level of offense. *See Bob Evans*, 163 F.3d at 1024 ("[W]e reject the Board's contention that concerted activities can take any form and reassert the approach adopted by the majority of the courts which have confronted the issue, namely, that the reasonableness of the means of protest is one of a variety of factors that are examined in order to determine whether employee activity is protected."). While the facts of this case would support an analysis of reasonableness of protest, the Board has stated in recent decisions that it believes the "reasonableness" test set forth in *Bob Evans* conflicts with United States Supreme Court precedent in *NLRB v. Washington Aluminum*, 370 U.S. 9 (1962). *See, e.g., Pheonix Processor Limited Partnership and Bradley Bagshaw*, 348 NLRB No. 4 (2006) (expressly affirming that reasonableness is not a requirement for concerted activity and citing its own *Trompler* decision). In affirming the Board, the Seventh Circuit in *Trompler* recognized the Board's request to overrule *Bob Evans* but instead affirmed the Board's decision on alternate grounds. *See Trompler*, 338 F.3d at 750-751. Because the Court finds that the probability that this walk-out pertained to a condition of employment is very low, it is not necessary to address the reasonableness of the means of employee action.

reasons stated above with respect to Section 8(a)(1), Petitioner may not have a strong likelihood of success on the merits, but has shown by a preponderance of the evidence that it has a "better than negligible" chance of success on the 8(a)(3) claim. Petitioner has presented limited evidence that the Union and its membership was at issue at the time that Figueroa was terminated. Even according to Respondent's version of events, Respondent fired one of two Union bargaining committee members as a result of the employees' collective walkout. The evidence in the Administrate Record is contested as to whether Parker told the employees that "they had no Union representative" when Figueroa stated that the employees were waiting for representative Martinez to arrive before returning to work.

Respondent argued in briefing and at the Hearing that the employees lost any protection for their protest because Section 9(a) of the Act requires unionized workers to go through their Union representative to express grievances. Both parties agree that the Union and Respondent were at a point in negotiations where the Union was representing the employees, but the Union and Respondent had not yet agreed upon a CBA. In light of the ambiguous status of the CBA at the time of the incident, and the fact that the employees stated they were waiting for their representative, the Section 9(a) defense does not resolve this issue definitively. [3] Respondent may present it position with respect to the application of Section 9(a) before the Board. For the limited purpose of

---

[3]Respondent argues that a term of the tentative agreement between itself and the Union was that Respondent would be given notice of any strike and that employees would work through their Union representatives to express their grievances. Petitioner responds to this argument that any tentative term of the CBA was not binding on them and that the tentative agreement is essentially irrelevant until the CBA is finalized. Ironically, Petitioner flips its argument concerning the tentative nature of the CBA when arguing that irreparable injury has occurred. In that case, Petitioner cites to Respondent's unilateral enactment of a drug policy as evidence of the regression of CBA negotiations because, according to Petitioner, a tentative drug policy was in effect at that time. The Court does not rely on the mercurial nature of either argument because it does not find that the parties had obligations to each other pursuant to any term in the tentative CBA which was still negotiated.

determining the probability of success, the record before the Court reflects that the one person the parties agree that Respondent terminated as a result of the events on June 27 was also one of the bargaining committee members. Petitioner has a "better than negligible" chance of success on the merits of the Section 8(a)(3) charge.

Irreparable Harm, Adequate Remedy at Law

Petitioner argues that the irreparable harm in this matter is the frustration of the remedial purpose of the Act. By allowing the Union to continue its unfair labor practices pending the resolution of the underlying charge before the ALJ, argues Petitioner, the passage of time and the continuing impact on both the terminated employees and the remaining employees would eviscerate the effect of an order from the Board. The effect of the terminations on the Union's ability to organize and collectively bargain constitutes evidence of irreparable harm with an inadequate remedy at law. *See Electro-Voice*, 83 F.3d at 1573 ("The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable"), *citing Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975). The Court considers whether "the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial power ineffectual." *Electro-Voice*, 83 F.3d at 1567. "As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases." *Electro-Voice*, 83 F.3d at 1573 (overturning district court determination that a "chilling effect" on union organization was mere speculation not warranting injunctive relief).

At the Hearing, held in order to allow Petitioner to present testimony supporting the existence of irreparable harm if the injunction did not issue, Petitioner supported his position with three

14

examples of how the Union's ability to collectively bargain was being adversely impacted: (1) that the bargaining process between the Union and Respondent "regressed" after the incident in June 2006; (2) that employees of Respondent feared participation in the Union and distrusted the Union's ability to represent them adequately; and (3) that the twenty terminated employees would need to find alternate work and would not be able to accept reinstatement by the time a final decision had been rendered. Petitioner has failed to meet its burden to show by a preponderance of the evidence that any of these examples indicate irreparable harm to the Union meriting an injunction.

### 1. Regression in Negotiations

First, Petitioner argued that the collective bargaining process had been regressing and would continue to regress if injunctive relief did not issue. Petitioner pointed to three pieces of evidence supporting regression: a decrease in the number of negotiating sessions after the incident, the implementation of a drug policy not agreed to by the Union, and the loss of bargaining committee members Salgado and Figueroa, whom the Union claims are irreplacable. As for "regression" as measured by the number of sessions, the Union and Respondent had met for collective bargaining sessions approximately forty times between April 2005 and June 2006 (rounded to approximately 2.8 sessions per month), but only ten times between the June 27 and the last meeting prior to the hearing, December 20 (approximately 1.6 sessions per month). Petitioner charges that the decrease in meetings shows that the June incident had a "chilling effect" on the CBA negotiations to the detriment of the Union. But in the Hearing, both Trone and Figueroa testified that while the number of bargaining sessions decreased, the parties continued to meet with regularity in the months following the incident.

Relying solely on the number of sessions is an inadequate indicator of the effectiveness of the negotiations. Although the number of sessions per month may have decreased from approximately 2.8 sessions per month to 1.6 sessions per month, there is no evidence that the frequency was linked to any slow-down in communications, refusal to negotiate, or obstinate positions taken by either side. In fact, neither side presented any evidence to suggest that issues were not being discussed, that the negotiations had lost substance, or that the parties had come to an impasse. Crucially, Trone testified that up until Figueroa gained employment with another company in December 2006, Responded permitted both Figueroa and Salgado to attend and participate in the CBA negotiating sessions in spite of their terminated status. According to the facts presented by Petitioner at the Hearing, there exists little evidence that the negotiations have substantively regressed.

Likewise, the implementation of a random drug-testing policy by Respondent does not support Petitioner's position that a regression occurred. Petitioner argues that Respondent's implementation of the random policy without negotiation shows a "regression" in collective bargaining. In spite of Petitioner's own position that the CBA is not final until it is signed and that neither side is bound to the tentative terms of the potential CBA, Petitioner wants this Court to find that the unilateral implementation of the drug testing policy indicates the erosion of the collective bargaining due to the June 2006 incident. Respondent instituted a random drug-testing policy for the employees sometime in the fall of 2006. But Figueroa testified at the Hearing that the drug policy had been implemented after a tragic death of one of the employees at the plant; upon examination of the accident, it became clear that the employee had cocaine in his system at the time of his death. Shortly after the employee's death, Respondent implemented a random drug-testing

policy for its employees. Meanwhile, Respondent continued to allow the drug policy to be a part of the on-going negotiations between Respondent and the Union since, as all parties knew and indicated repeatedly at the Hearing, the CBA had not been finalized. What is critical here is that Respondent had an eminently reasonable justification for the implementation of a policy to protect its employees subsequent to an employee death within the plant, that the implementation of the policy did not violate any CBA, and that policy remained subject to negotiation with the Union to be hammered out in the CBA; and that the Respondent and Union continued to negotiation.

The evidence presented at the Hearing also failed to support Petitioner's argument that the Union negotiations would be irreparably harmed by the loss of Figueroa and Salgado. Initially at the Hearing, counsel for Petitioner argued that Figueroa and Salgado were the bilingual representatives of the employees and therefore uniquely suited to be members of the bargaining committee - a plausible reason why these two members would be irreplaceable in a primarily Spanish-speaking workplace. But neither Figueroa nor Trone could not confirm on cross-examination that no other members could speak both Spanish and English, and a review of the Administrative Transcript reveals that other employees testified in English as to the events that occurred on June 26th and 27th, without the help of a translator. (Admin. Tr. at 15). When pressed, Trone testified that Salgado and Figueroa were irreplaceable not so much for language reasons as because they knew the history of the bargaining process and therefore were better suited to continue negotiations.[4] But Figueroa testified to the already-existing method by which the employees could elect a new committee member in the event a bargaining committee member were to withdraw from his position. No one presented

---

[4]Figueroa testified at the hearing that his difficulty in contacting current employees had more to do with not having accurate phone numbers than that employees were not able to communicate with him due to language barriers.

testimony that other employees refused to be elected or expressed fear of being on the bargaining committee; indeed, the testimony indicated that no one had tried to commence the process to replace Figueroa and Salgado.

### 2. Fear of continued Union participation

Second, Petitioner stated in opening argument at the Hearing that it would show by testimony that the "unfair labor practice is implied with the impact has been in terms of the fact that there's been less support at meetings, they're no longer able to have meetings, no longer able to communicate with employees, employees aren't willing to step up and replace either Paris or Jesse at the bargaining table." Further Petitioner stated that "no one has taken over the role of the [Union] representative . . . [because] they [the employees] have seen what happened to employees who support the union and are very afraid" and that "as the other employees have seen what's happened their support for the union has begun to erode at a critical time for the union." Evidence of fear of continued participation in the Union or retaliation against participating employees is relevant to the need for injunctive relief and could certainly support Petitioner's position. Unfortunately, merely stating the conclusions without factual support does not make those conclusions true.

The witnesses testifying on behalf of Petitioner at the Hearing - the terminated bargaining committee member Figueroa, and current Union Representative Trone - testified solely to previous conversations with a few individual members of the Union, fewer of whom could be identified by name, who had spoken to the witnesses about the incident and/or the union bargaining process subsequent to the incident.[5]  Figueroa testified that one of the employees had called him to check

---

[5] In spite of being granted an opportunity for the hearing in order to present testimony to support its position and in spite of bearing the burden of proof, Petitioner chose to present testimony about fear of retaliation via Federal Rule of Evidence 803(3), the "then existing state of mind" exception to the exclusion of hearsay, through the testimony of

on the status of collective bargaining; this statement if anything supported the employee's frustration with current Union leadership, not that employees feared termination or retaliation if they participated in the Union. Another employee, Mr. Sundara, told Mr Trone, that he was disappointed that the representatives "didn't get those twenty people back." Again, a statement expressing frustration regarding negotiations necessarily takes into account that there are on-going, active negotiations. The law does not require that the Union win every negotiation; but rather, that those individuals who have unionized must be free to negotiate without fear of retaliation or diminution of their efforts due to Respondent's actions. Mr. Figueroa stated that some unknown employees on the picket line stated to him that they were afraid that if they did not come back to work on the third day that the company policy was that after three days "if you are a no show with no call, you will be fired." This unidentified hearsay testimony is rebutted by the undisputed testimony that the second shift employees received a letter from Respondent stating that they were not fired.

Petitioner's conclusion that other employees were afraid to step up to replace the two union representatives is also not supported by the evidence. First, there was no need to have other employees step up to replace the representatives because, in spite of being terminated by Respondent, Respondent continued to allow both men to participate in the CBA negotiations. Until a few weeks ago, this was the status quo of the negotiations. At the end of December 2006, however, Respondent

---

Figueroa and Trone. *Compare Electro-Voice*, 83 F.3d at 1572 (fear established through Union representative testimony about the fear of non-testifying employees, corroborated by testimony of other employees still employed at the plant). Upon request by the Court, Petitioner submitted additional case law supporting its position that non-testifying witness statement about fear of retaliation could be admitted pursuant to 803(3). The Court initially limited the testimony and then shortly thereafter allowed the two witnesses to convey the hearsay statements of others as their "then existing state of mind." Testimony of union members' fear of retaliation has been admitted pursuant to 803(3), but not to prove anything about what conduct caused that perception. *See Lightner v. Dauman Pallet, Inc.*, 823 F. Supp. 249, 252 n.2 (D.N.J. 1992). Regardless of Petitioner's strategic choice to establish fear through hearsay statements and not actual live witnesses whose credibility could be judged by this Court, Petitioner failed to meet the burden to establish fear because none of the state of mind statements indicated fear of participating in the union process; but rather, dissatisfaction with the slow process of the CBA negotiations.

determined that it no longer wanted to have individuals at the table who were employed by other employers, thereby limiting the potential disclosure of confidential negotiations regarding the conditions of employment at Respondent's company. No evidence has been presented that subsequent to that meeting, other employees have refused to take the place of the terminated employees who have become employed elsewhere. The mere fact that there was no need to bring in other employees until this year indicates that Petitioner's position at hearing is not supported by the record.

Next, Petitioner claims that there has been less support at meetings. Nothing in the record indicates that the population attending the meetings has declined or that substantive issues being discussed are no longer on the table.

Finally, Petitioner claimed that other employees are not willing to step up and replace either Figueroa or Salgado. Once again, simply arguing this position does not make it factually accurate. The record reflects that Steve Swanson contacted Trone months after the incident, in late December, to convey that he was concerned that the union was not making any progress and that the union was losing support in the plant. The potential causal connection between the June 2006 incident and the opinion of one member of the bargaining committee that no progress was being made in the negotiations is not sufficient to support that the incident caused this employee's frustration. The mere fact that 20 months of negotiation had not resulted in a CBA could easily account for the same frustration.

If there had been evidence presented that the Union had not been able to sign up additional members, or that members had dropped out, this might have sustained a finding of irreparable harm warranting an injunction. In *Electro-Voice*, the union member meetings stopped immediately after

the incident prompting the charge before the Board. *See Electro-Voice,* 83 F.3d at 1572. In this case, Trone testified that the Union had previously held member meetings to discuss the status of the CBA negotiations, which in his opinion had been well-attended prior to the incident. But Trone himself testified at the Hearing that the Union itself made the decision to stop member meetings in order to "be as solid as we could" and to insure that the terminated employees did not have a confrontation with the employees who replaced them. This, if anything, implies that the replacement employees would have been invited to Union member meetings - and had themselves joined the Union. This does not support a finding that Petitioner has shown by a preponderance of the evidence that employees feared continued Union participation or that the Union had been unable to recruit new employees.

### 3. Continued harm to terminated employees

Finally, Petitioner argued that failure to grant an injunction would interfere with the remedial purposes of the Act because the passage of time would eviscerate any remedy that reinstatement and back pay could afford the terminated employees. Petitioner points us to two cases, *Squillacote* and *Kinney*, both of which held that failure to grant an injunction interfered with the remedial purpose of the Act. *See Kinney*, 881 F.2d at 493-94 (vacating denial of an injunction where district court failed to address irreparable injury prong); *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir. 1976) (courts should consider "the need for an injunction to prevent frustration of the basic remedial purpose of the act" as well as more traditional equitable considerations).

But Petitioner strives to argue that harm to the twenty employees should equal irreparable harm meriting an injunction. The twenty discharged employees are the very persons in this dispute

that have an unquestionable remedy at law; if the Board rules in the employees'/Union's favor, those wrongfully terminated employees will by statute be reinstated with back pay. If the Court were to accept Petitioner's position that failure to grant an injunction frustrates the purpose of the Act because the twenty employees will be harmed by the passage of time, without an adequate showing of either a chill in negotiations, a fear of participation in the Union, or some description of how the passage of time harms a larger collectively bargaining purpose than returning these employees to work, then every labor dispute involving a terminated employee would warrant an injunction pursuant to 10(j). *See Eisenberg v. NLRB*, 61 f.2d 902, 906-7 (3d Cir. 1981) (the application for 10(j) relief is not "on behalf of individual employees, but in the public interest"). A decision from the Board, and the appellate process, will always take time; as a result, laborers will always have to choose whether to seek a new job in the interim, and if they do seek a new job, choose whether to leave that new job to accept reinstatement. The discharge of workers always harms the workers while they await a decision; to decide that this harm alone satisfies the "irreparable harm" prong without more would require courts to grant every injunction before them.

The individual discharged workers have an adequate remedy at law. Without further evidence of irreparable harm to the unionization process or the collective bargaining process as a whole, this alone does not show evidence of irreparable harm. Petitioner has not met its burden to show by a preponderance of the evidence that there exists an irreparable harm that has no adequate remedy at law and merits injunctive relief.

<u>Effect upon the Public Interest</u>

Finally, Petitioner must show by a preponderance of the evidence that the public interest would be harmed in the absence of an injunction. Courts weigh the benefits and costs to the public

stemming from the grant or denial of injunctive relief. *See Electro-Voice*, 83 F.3d at 1574. As with a demonstration of irreparable harm, "the public interest is furthered, in part, by ensuring that 'an unfair labor practice will not succeed because the Board takes too long to investigate an adjudicate the charge.'" *Electro-Voice*, 83 F.3d at 1574, *quoting Miller, for and on behalf of the NLRB v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir. 1994).

For many of the reasons stated in the previous section, Petitioner failed to meet its burden to show that the public interest will be harmed if an injunction does not issue. In terms of the effect of this decision on the public interest, it is worth reiteration that this case is not one in which evidence has been presented that a plant is attempting to create a union from a non-unionized workforce. Many of the cases relied upon by Petitioner are cases in which an employer's actions squelched a burgeoning union, thereby hindering the creation of a unionized force. *See, e.g. Bloedorn*, 276 F.3d at 291 (ample evidence to conclude that a company had fired employees in order to avoid having to recognize a union); *Electro-Voice*, 83 F.3d at 1573 (fearing that passage of time will put out "the spark to unionize"). In this case, by contrast, the Union was generally elected by the employees a year and a half ago, has been negotiating with Respondent that entire period, and continues to negotiate on behalf of the employees of Respondent. Based on the testimony at the Hearing, the Union already has procedures in place for meeting with the employees, updating them on the status of negotiations, electing members to the bargaining committee, and replacing those committee members as necessary. The collective bargaining process is established and has been active and ongoing subsequent to the termination of the twenty employees. Like the demonstration of irreparable harm, Petitioner has not demonstrated why this case will damage the public interest if the injunction does not issue.

<u>Conclusion</u>

Because Petitioner has failed to show by a preponderance of the evidence that there will be irreparable harm for which there exists no adequate remedy at law absent an injunction, and because Petitioner has failed to show that public interest will benefit from the issuance of an injunction, Petitioner's request for Section 10(j) injunctive relief pending a decision of the Board is denied. So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:  January 18, 2007